COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Bray and Senior Judge Overton


JENNIFER INGRAM

MEMORANDUM OPINION[*]
v.    Record No. 1890-01-2                    PER CURIAM
                                           JANUARY 8, 2002
RICHMOND DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Randall G. Johnson, Judge

(Rhonda L. Earhart, on brief), for appellant.

(Alexandra Silva, Assistant City Attorney;
Scott Cardani, Guardian <u>ad</u> <u>litem</u> for the
Infant Child, on brief), for appellee.


Jennifer Ingram (mother) appeals the decision of the circuit court terminating her residual parental rights to her son, Robert Tomonia, Jr. (the child). On appeal, mother contends the trial court erred in finding the evidence sufficient to terminate her residual parental rights under subsections (1) and (2) of Code § 16.1-283(C). Upon reviewing the record and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the trial court. <u>See</u> Rule 5A:27.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

On appeal, we view the evidence and all the reasonable inferences in the light most favorable to appellee as the party prevailing below.  See McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990).  So viewed, the evidence proved that, in early January 1999, police and Child Protective Services workers (CPS workers) of the Richmond Department of Social Services (RDSS) responded to a disturbance at the home mother then shared with Robert Tomonia, the child's father.  Following that incident, RDSS lodged a complaint regarding the child.

On January 8, 1999, the police responded to another call at mother's home.  As a result, RDSS lodged a second complaint.

On January 13, 1999, mother and CPS worker Alice Dow executed a written contract whereby mother agreed to "contact TASC[1] . . . and arrange to have a substance abuse evaluation," sign a consent form for the evaluation results to be released to RDSS, "participate in any treatment recommended by TASC/RBHA,"[2] file for a protective order against father and "cooperate with Richmond [DSS]."

On January 14, 1999, CPS workers again responded to mother's house.  The child's father alleged that mother cut him with a

_____

[1] "TASC" is an acronym for Treatment Assessment Service Center.  The center performs substance abuse evaluations.

[2] "RBHA" is an acronym for Richmond Behavioral Health Authority.

-

knife.  Police arrested and jailed mother on January 15, 1999,
based on father's complaint.  At the time of mother's arrest, RDSS
"had already begun an investigation based on the first [CPS]
complaint."  CPS worker Dow visited mother in jail.  She testified
that RDSS was "unable to find the child at that time," but mother
gave Dow "the name of the baby-sitter where she thought the child
was."  Dow obtained an emergency removal order, located the child
and placed him in a foster home in January 1999.

During her visit with mother at the jail, Dow noticed that
mother had two black eyes and bruises on her neck area.  The child
was with mother when the father assaulted her, and blood from
mother's wounds splattered on the child.  Dow testified that RDSS
focused on three areas of concern regarding mother:  parenting
skills, substance abuse and domestic violence.

On April 19, 1999, RDSS returned the child to mother.

On April 28, 1999, the police informed RDSS that they had
responded to another domestic violence call at mother's address.

On May 4, 1999, Dow obtained another emergency removal order.
Dow contacted mother and father and advised them she had a removal
order, but "neither would say where the child was."  Eventually,
the police located the child and took him into custody.  Dow
explained that the "[c]ourt again ordered" that mother and father
participate in substance abuse treatment.  Father was again
ordered to participate in the Family Violence Prevention Program,
and mother was "to go to parenting [classes], to counseling for

-

domestic violence, and to TASK [sic] for substance abuse evaluation and treatment."

Dow sent mother and father several letters "advising them of what they needed to do to comply with the court order." Whereas father refused to comply with the program, mother "indicated a willingness to go to some of the programs she was ordered to attend." RDSS provided bus tickets to mother to assist her in getting to the programs. Mother went to "TASC for a[] [drug abuse] evaluation on several occasions," and "[s]he went to an outpatient treatment program at Rubicon one time," but she "left early and did not return to that program."

Mother attended a total of eleven counseling sessions conducted by the YWCA for victims of domestic violence. Nine of the eleven sessions took place between April 16, 1999 and August 19, 1999. The record also showed that she missed a total of seven scheduled appointments during that period. Moreover, despite the social worker's suggestion that mother continue attending the YWCA program after August 1999, mother attended only two more sessions prior to the May 23, 2001 hearing: one on October 13, 1999, and one on December 13, 2000.

Dow also recommended that mother attend weekly parenting sessions conducted by "SCAN"[3] free of charge. Although there is no specific number of sessions one is required to attend, SCAN's

_____

[3] "SCAN" is an acronym for a program entitled Stop Child Abuse Now.

-

assistant director recommended in a letter that "members come to a minimum of 12 to 16" sessions.

Regarding substance abuse, mother admitted to Dow that she had problems with alcohol. Dow referred to juvenile court records indicating that mother "had been ordered to obtain evaluation and treatments since approximately 1990 or '92 for the same problem." According to Dow, as of the May 23, 2001 hearing, mother had never completed a substance abuse program.

Dow testified that mother and father "had not maintained a stable household since the child was born." Dow noted there were police reports of "drinking or substance abuse by both parties." She characterized mother's participation in programs that were offered as inconsistent. Dow also acknowledged that mother and father have admitted to using drugs and alcohol in the child's presence.

Loretta Scott-Jarrett was the social worker assigned to work with the case in April 1999, when the child was placed in foster care a second time. When the child was first removed in January 1999, he was nine months old. Scott-Jarrett recalled that "both parents were involved with family violence." Thus, there was much focus on completing a family violence program and drug treatment.

The April 1999 foster care plan, following the child's second foster care placement, had a goal of return home with a target date of December 1999. Scott-Jarrett testified that mother entered and attended some programs but "didn't complete any" of

-

them.  As the child got older, he exhibited "speech and language delays," so he was placed in an intervention program.  At the time of the hearing, the child was three and was doing much better verbalizing.  Mother did not participate in the intervention speech program with the child.

Scott-Jarrett recalled that the goal in the April 1999 foster care plan "had been return home until April of 2000 where we entered the goal of placement with a relative," namely, mother's sister, the child's maternal aunt; however, mother's sister indicated she was unable to accept placement because she cared for a special needs child.  Throughout the child's placement in foster care, Scott-Jarrett had more contact with mother than father.  She stated that mother "was very much aware of the services that needed to be completed."

The child was initially placed in a two-parent foster home and remained there until the May 23, 2001 hearing.  Scott-Jarrett described the foster parents as "very nurturing," and she noted that the child was "progressing well" and attached to both foster parents.  She testified that the child's "[n]eeds are being met adequately in all aspects."  The foster parents "are very in-tune to [the child's] needs, to his delays; and [they] participated fully in the [speech] intervention, [which] took place in [their] home."

Scott-Jarrett stated that mother's visitation with her son "was very regular up until December of [19]99," when visitation

-

"began to decline."  Mother "missed three [visits] consecutively" in December 1999.

Scott-Jarrett recalled that mother failed to complete the recommended minimum of three months in the SCAN program or a substance abuse program.  Scott-Jarrett explained that in this type of case "with the goal being return home," RDSS tries "to assist the parents to remedy the situation that resulted in the [child's] removal."  If that is not successful or "achievable," RDSS seeks the next less severe goal, "which in this case was placement with a relative."  If that is unworkable, then the goal of adoption becomes an option.

Sebastian Symeonides replaced Scott-Jarrett as the child's social worker in July 2000.  The foster care goal at that time was placement with relatives; however, at the July 2000 hearing, the plan was disapproved because the relative was unwilling to care for the child.  Mother failed to attend that hearing, and father adamantly refused to participate in any programs.

Following the July 2000 hearing, Symeonides submitted a goal of adoption for the child.  He explained that the child "had been in [foster] care for some time."  Symeonides was able to reach mother on October 10, 2000.  He asked why she did not attend the July 2000 hearing and had broken off contact.  Mother told Symeonides "that she was basically in hiding because she had an outstanding warrant."  In response to Symeonides' inquiry whether, according to father, she was pregnant, mother informed him "she

-

was pregnant, that she was ill, and she lost the child." She admitted to Symeonides "that she had used crack cocaine, she had used heroin, but that didn't cause her to lose the child." According to Symeonides, mother "said she became ill from drinking beer, and because of that she had a hysterectomy." At that time, mother was not in a substance abuse program, but said she would like to enter one. Symeonides testified that since the goal was changed to adoption, mother's situation had not improved.

On October 16, 2000, RDSS filed a petition in juvenile court to terminate mother's parental rights pursuant to Code § 16.1-283(C)(1) and/or Code § 16.1-283(C)(2).

Symeonides testified that after an October 26, 2000 juvenile court hearing at which the termination proceedings were continued, mother "was screaming and belligerent" and threatened him.

Mother testified that she had not taken drugs in three years, and she denied telling Symeonides she lost the baby because she consumed beer. She said she lost the baby due to anemia, which caused a miscarriage. Mother did not explain why she attended only two drug abuse meetings.

The trial court found that RDSS proved its case by clear and convincing evidence under subsections (1) and (2) of Code § 16.1-283(C).

### ANALYSIS

Code § 16.1-283(C) provides that a court may terminate the residual parental rights of a parent of a child placed in foster

-

care as a result of court commitment.  The court must first find, by clear and convincing evidence, that termination is in the best interests of the child.

In addition, the court must find, by clear and convincing evidence, one of the following:

> [That] [t]he parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship[,]

Code § 16.1-283(C)(1), or

> [that] [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

RDSS placed the child in foster care in January 1999, following three domestic violence disturbances between mother and father during that month.  Police arrested mother during the third incident.  Although RDSS returned the child on April 19, 1999, it

-

removed him again in May 1999 following a fourth domestic violence incident on April 28, 1999.

<u>Termination Under Code § 16.1-283(C)(1)</u>

The child remained continuously in foster care until the May 23, 2001 hearing, a period of two years. The evidence showed that mother regularly visited her son until December 1999, at which time visitation declined. Scott-Jarrett testified that at some point, the juvenile court ordered no contact between both parents and the child. She thought the order occurred at the April 2000 hearing; however, the record contains no April 2000 transcript or order limiting mother's contact. Moreover, Scott-Jarrett's involvement in the case ended at the end of June 2000, at which time Symeonides assumed responsibility for the case. Symeonides testified that mother had not visited the child since he took over the case.

RDSS established that mother's contact with the child decreased beginning in December 1999, and stopped after July 2000. Therefore, RDSS sufficiently proved that mother, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care. <u>See</u> Code § 16.1-283(C)(1). Accordingly, the trial court did not err in terminating mother's residual parental rights under that code section.

-

## Termination Under Code § 16.1-283(C)(2)

On January 13, 1999, mother signed a contract with RDSS in which she agreed to obtain a substance abuse evaluation, forward the results of that evaluation to RDSS, participate in any treatment recommended by the substance abuse evaluators, file for a protective order against father and cooperate with RDSS.

The evidence established that mother failed to complete or satisfactorily participate in any of the various programs that RDSS recommended. Although she attended several sessions of a YWCA domestic violence counseling program from April 16, 1999 until August 19, 1999, she missed a total of seven scheduled appointments during that period. Moreover, despite the social worker's suggestion that mother continue attending the YWCA program after August 1999, mother attended only two more sessions prior to the May 23, 2001 hearing: one on October 13, 1999, and one on December 13, 2000.

Mother attended only three parenting sessions offered by SCAN. That number was well below the minimum recommended by the program.

Moreover, the record is replete with evidence that mother has a substance abuse problem which she never satisfactorily addressed. Although mother went to TASC for drug abuse evaluations, she failed to enter and successfully complete a substance abuse program. Mother attended one session of an outpatient program but did not attend anymore. Thus, of the four

-

conditions that mother agreed to perform under the January 13, 1999 contract, the only one she successfully performed was filing for a protective order against the father.

Mother also contends the domestic violence against her by the father was the sole reason for the child's placement in foster care and that she remedied that condition when she obtained a protective order against him. However, the record demonstrates otherwise.

RDSS directed mother to attend family abuse counseling and parenting classes, both of which were intended to ameliorate the effects of father's abuse on mother and child. Mother failed to cooperate with RDSS and attend a satisfactory number of sessions of either program.

The record further shows that both parents abused alcohol and/or drugs in the child's presence and acted violently toward each other. Substance abuse was an additional factor in the reason for removing the child, and mother failed to obtain treatment despite substantial assistance by RDSS.

Therefore, the trial court did not err in finding that RDSS proved by clear and convincing evidence that mother was unwilling or unable to remedy substantially the conditions which led to the child's foster care placement. <u>See</u> Code § 16.1-283(C)(2).

For these reasons, the trial court did not err in terminating mother's parental rights. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

<u>Affirmed.</u>